GRAHAM WYLIE,

          Plaintiff,

v.

POWERSCREEN INTERNATIONAL
DISTRIBUTION, LTD., and
POWERSCREEN USA, LLC,

          Defendants,

v.

POWERSCREEN CONNECTICUT, INC.,

          Third Party Defendant.

Civil Action No.
3:16-cv-00464 (CSH)

**OCTOBER 5, 2018**

## RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**HAIGHT, Senior District Judge:**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Defendants and Third Party Plaintiffs Powerscreen International Distribution, Ltd. ("Powerscreen International") and Powerscreen USA, LLC ("Powerscreen USA") jointly move for summary judgment on their Amended Third-Party Complaint, [Doc. 44], against Third Party Defendant Powerscreen Connecticut, Inc. ("Powerscreen CT"). Doc. 60. Defendants allege that contractual indemnity requires Powerscreen CT "to hold the Defendants harmless for all expenses incurred so far defending the Plaintiff's claims, assume all costs of defense moving forward, and indemnify Defendants for any and all future liability for a settlement, verdict, or judgment." *Id.* at 2. This Ruling resolves the motion.

# I.  STANDARD OF REVIEW

A motion for summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The moving party must "demonstrate the absence of any material factual issue genuinely in dispute" to be entitled to summary judgment.  *Am. Int'l Grp., Inc. v. London Am. Int'l Corp.*, 664 F.2d 348, 351 (2d Cir. 1981) (citing *Heyman v. Commerce & Indus. Ins. Co.*, 524 F.2d 1317, 1319–20 (2d Cir. 1975)) (internal quotation marks omitted).  All inferences and ambiguities must be viewed in the light most favorable to the nonmoving party. *Rogoz v. City of Hartford*, 796 F.3d 236, 245–46 (2d Cir. 2015).

"In order to defeat a summary judgment motion that is properly supported by affidavits, depositions, and documents as envisioned by [Rule 56], the opposing party is required to come forward with materials envisioned by the Rule, setting forth specific facts showing that there is a genuine issue of material fact to be tried." *Gottlieb v. Cty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996).  The non-moving party cannot "defeat the motion by relying on the allegations in his pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible." *Id.* (citations omitted).  In other words, "[w]hen the moving party has carried its burden under Rule 56[], its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The nonmoving party "must present specific evidence demonstrating a genuine dispute." *Gannon v. UPS*, 529 F. App'x 102, 103 (2d Cir. 2013) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  "An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  A fact is material if it might affect the outcome of

the suit under the governing law." *Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010) (internal quotation marks and citation omitted); *see also Anderson*, 477 U.S. at 248 ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.").

## II. FACTUAL BACKGROUND

The following undisputed or indisputable facts are derived from the parties' submissions pursuant to Local Rule 56(a) and the affidavits and exhibits attached to the parties' submissions. All reasonable inferences have been drawn in Third Party Defendant Powerscreen CT's favor.

Defendant and Third Party Plaintiff Powerscreen International manufactured a Powerscreen Warrior 1800 Screener (the "Screener") and distributed it to Defendant and Third Party Plaintiff Powerscreen USA, who in turn sold it to Powerscreen CT. Doc. 60-2 ("Defs. 56(a) Stmt.") ¶¶ 1, 5; Doc. 69-1 ("Third Party Def. 56(a) Stmt.") ¶ 1. Powerscreen CT employed Plaintiff Graham Wylie, who initiated the underlying product liability action due to an injury sustained on March 24, 2014, from falling off the Screener. Defs. 56(a) Stmt. ¶¶ 5, 19. Prior to the accident, Powerscreen CT had purchased hundreds of pieces of equipment from Powerscreen USA over the course of fifteen years. *Id.* ¶ 14.

Two contracts are relevant to indemnity issues regarding Plaintiff's injuries: (1) the distribution agreement ("Distribution Agreement") between Powerscreen USA and Powerscreen CT, [Doc. 60-3 (the "Distr. Agmt.")], and (2) the terms and conditions ("Terms and Conditions")

contained on the reverse side of the sales invoice for the Screener, [Doc. 60-6 at 3 (the "T&C")].[1]
*See* Defs. 56(a) Stmt. ¶¶ 2, 7; Third Party Def. 56(a) Stmt. ¶ 7.

On or about January 1, 1999, Powerscreen USA and Powerscreen CT entered into the
Distribution Agreement with Powerscreen USA as the "Company" and Powerscreen CT as the
"Distributor." Defs. 56(a) Stmt. ¶ 2; Distr. Agmt. at 1–2. The Distribution Agreement governs the
parties' relationship in which Powerscreen CT serves as Powerscreen USA's "exclusive distributor
in the Territory for the sale of Products." Distr. Agmt. ¶ 2.1. The Distribution Agreement contains
two indemnity provisions, which relate to liability arising out of misrepresentations or infringement
issues and are not relevant to this case. *See id.* ¶¶ 3.12, 3.20. However, the Distribution Agreement
also references Powerscreen USA's terms and conditions of sale in three places. First is paragraph
6.4, stating:

> Products will be sold by the Company to the Distributor on the
> Company's standard terms and conditions of sale from time to time;
> the current terms and conditions being attached hereto as Schedule 2.
> If there shall be any conflict between such terms and conditions and
> the terms and conditions of this Agreement, the terms and conditions
> of this Agreement shall prevail[.]

*Id.* ¶ 6.4.

Second, the warranty section obligates Powerscreen USA to "observe the warranty provisions
contained in the Company's standard terms and conditions of sale attached as Schedule 2 (subject

---

[1] "Terms and Conditions" and the abbreviated citation "T&C" refer to the terms and
conditions specifically accompanying the sale of the Screener. Mentions of "terms and
conditions"in lowercase letters refer to Powerscreen USA's terms and conditions of sale in
general.

to the provisions of Clause 3.20 of this Agreement)[.]"[2]  *Id.* ¶ 9.1.

Third is the merger clause, which reads:

> This Agreement sets forth the entire agreement between the parties with respect to the subject matter herein and supersedes and replaces all prior communications, representations, warranties, stipulations, undertakings and agreements whether oral or written between the parties.  The terms and conditions contained or referred to herein relating to the sale of Products shall be to the exclusion of any terms and conditions of purchase submitted at any time by the Distributor whether printed on or sent with any order form or otherwise[.]

*Id.* ¶ 15.1.

The Distribution Agreement also includes other provisions that may affect contract interpretation.  One states that "[n]o variation to this Agreement shall be effective unless in writing signed by a Director or other duly authori[zed] officer of each of the parties hereto[.]"  *Id.* ¶ 16.  The other is the waiver clause,[3] which indicates that failure to object any right does not equate to a waiver of that right.  *Id.* ¶ 17.1.

---

[2]  Clause 3.20 is an indemnity clause concerning intellectual property violations.  Distr. Agmt. ¶ 3.20.

[3]  This provisions states:

> Failure to exercise or delay in exercising on the part or either party any right, power or privilege of that party under this Agreement shall not in any circumstances operate as a waiver thereof nor shall any single or partial exercise of any right, power or privilege in any circumstances preclude any other or further exercise thereof or the exercise of any other right, power or privilege[.]

Distr. Agmt. ¶ 17.1.

As mentioned in paragraph 6.4 of the Distribution Agreement, Schedule 2 contains the terms and conditions of sale, "current" at the time of contracting the Distribution Agreement in 1999.[4] Distr. Agmt. at 17. Schedule 2 does not include any indemnity provisions nor does it much mirror the version of the Terms and Conditions accompanying the invoice dated February 29, 2012, for the sale of the Screener. *See id.*; Defs. 56(a) Stmt. ¶¶ 14, 5–7; T&C ¶ 15. The updated Terms and Conditions include an indemnity clause (the "Indemnity Clause"), which reads as follows:

> **Indemnification by Buyer.** Buyer hereby agrees to indemnify, release, defend and hold harmless Seller, its directors, officers, employees, agents, representatives, successors, and assigns against any and all suits, actions or proceedings at law or in equity (including the costs, expenses and reasonable attorney's fees incurred in connection with the defense of any such matter) and from any and all claims demands, losses, judgments, damages, costs, expenses or liabilities, to any person whatsoever (including Buyer's and Seller's employees or any third party), or damage to any property (including Buyer's property) arising out of or in any way connected with the performance or the furnishing of Parts or Equipment under this agreement, regardless of whether any act, omission, negligence (including any act, omission or negligence, relating to the manufacture, design, repair, erection, service or installation of or warnings made or lack thereof with respect to any parts or Equipment furnished hereunder) of Seller, its directors, officers, employees, agents, representatives, successors or assigns caused or contributed thereto. If Buyer fails to fulfill any of its obligations under this paragraph or this agreement, Buyer agrees to pay Seller all costs, expenses and attorney's fees incurred by Seller to establish or enforce Seller's rights under this paragraph or this agreement. The provisions of this paragraph are in addition to any other rights or obligations set forth in this agreement.

T&C ¶ 15.

---

[4] Powerscreen CT argues Schedule 2 contains a relevant provision: "Any Contract between the Company and the customer shall incorporate these conditions, which conditions shall not be varied other than with written confirmation by the Company from its head office." Doc. 69 at 12; Distr. Agmt. at 17, ¶ 2.

Defendants allege that Powerscreen CT received invoices containing terms and conditions with "substantially identical indemnity clauses since at least 2006, covering over 80 sales." Defs. 56(a) Stmt. ¶ 14. Powerscreen CT admits it received these invoices but denies that the indemnity clauses are valid because they are inconsistent with the Distribution Agreement. Third Party Def. 56(a) Stmt. ¶ 14.

## III. DISCUSSION

Pending before the Court is a motion for summary judgment by Defendants on their Amended Third-Party Complaint. Defendants claim Powerscreen CT is contractually obligated to indemnify Defendants in the underlying action. Doc. 60 at 2.

### A. Choice of Law

Before delving into the substance of the motion, the Court must determine which state's law governs Defendants' third-party claim. Jurisdiction is grounded in diversity, so the Court applies the forum state's choice of law rules. *Curley v. AMR Corp.*, 153 F.3d 5, 12 (2d Cir. 1998). Connecticut law generally upholds parties' choice of law provisions. *Elgar v. Elgar*, 679 A.2d 937 (Conn. 1996) (adopting Restatement (Second) of Conflict of Laws § 187 (Am. Law Inst. 1971)).

The Distribution Agreement and Terms and Conditions both indicate that Kentucky law governs contract interpretation. Distr. Agmt. ¶ 21 ("The formation, construction, performance, validity and all aspects whatsoever of this Agreement and of each order placed by the Distributor pursuant to the provisions hereof shall be governed by the laws of the commonwealth of Kentucky[.]"); T&C ¶ 18 ("This terms of sale agreement constitutes the entire agreement between the parties regarding the subject matter hereto and shall be construed and enforced in accordance with the laws of the State of Kentucky."). Even the terms and conditions of sale in place when the

Distribution Agreement was signed in 1999 also includes a similar choice of law clause in paragraph 18: "The Contract is governed in all respects by the laws of the Commonwealth of Kentucky." Distr. Agmt. at 18. Accordingly, the Court will use Kentucky law to examine Defendants' third-party claim.

**B.      Validity of the Indemnity Clause**

Although the underlying action is based in tort, this motion concerns a contract issue. Defendants seek to enforce the Indemnity Clause contained in the Terms and Conditions supposedly governing the sale of the Screener that led to Plaintiff's injury. Doc. 44. Powerscreen CT denies the validity of the Indemnity Clause, enforcement of which would leave it responsible for Powerscreen USA's expenses and liabilities incurred as a result of this lawsuit.[5] Docs. 44, 69. Adjudication of this issue requires examining two related contracts: the Distribution Agreement and the Terms and Conditions. The clear language in both contracts lead this Court to conclude that the Indemnity Clause is valid.

"Generally, the interpretation of a contract, including determining whether a contract is ambiguous, is a question of law for the courts." *Cantrell Supply, Inc. v. Liberty Mut. Ins. Co.*, 94 S.W.3d 381, 385 (Ky. Ct. App. 2002); *see also Lexicon, Inc. v. Safeco Ins. Co. of America, Inc.*, 436 F.3d 662, 670 (6th Cir. 2006) (collecting cases). Contract ambiguity exists "if a reasonable person would find it susceptible to different or inconsistent interpretations." *Lexicon, Inc.*, 436 F.3d at 670 (citations and internal quotation marks omitted). If a court determines the language is ambiguous, "areas of dispute concerning the extrinsic evidence are factual issues and construction of the contract

_____

[5] The Court discusses whether Powerscreen International benefits from enforcement of the Indemnity Clause *infra* in Section III.D.

become subject to resolution by the fact-finder." *Id.* (citations and internal quotation marks omitted). However, "[i]f the language is unambiguous, the meaning of the language is a question of law, and the intent of the parties must be discerned from the words used in the instrument." *Taggert v. United States*, 880 F.2d 867, 870 (6th Cir. 1989); *see also Luttrell v. Cooper Industries, Inc.*, 60 F. Supp. 2d 629, 631 (E.D. Ky. 1998).

A court must construe a contract "in accordance with the intention of the parties." *Journey Acquisition-II, L.P. v. EQT Prod. Co.*, 39 F. Supp. 3d 877, 887 (E.D. Ky. 2014) (citations and internal quotation marks omitted). A court must also "read the various provisions of the contract as a whole, and should look to interpretations that 'promote harmony' between any apparently conflicting provisions." *Id.* (citations omitted). An unambiguous written contract "will be enforced strictly according to its terms . . . by assigning language its ordinary meaning and without resort to extrinsic evidence." *Frear v. P.T.A. Indus., Inc.*, 103 S.W.3d 99, 105–06 (Ky. 2003). "If, however, the contract is 'facially susceptible to more than one interpretation,' the Court will give 'great weight' to the parties' actions, subsequent conduct, or other declarations indicating their mutual intent and understanding." *Journey Acquisition-II, L.P.*, 39 F. Supp. 3d at 887 (quoting *L.K. Comstock & Co., Inc. v. Becon Const. Co.*, 932 F. Supp 948, 965 (E.D. Ky. 1994) (citing *A.L. Pickens Co. v. Youngstown Sheet & Tube Co.*, 650 F.2d 118, 120 (6th Cir. 1981) (internal quotation marks omitted))).

### i. Encompassing Plaintiff's Claims

The Court first turns to the Indemnity Clause located within the Terms and Conditions accompanying the sale of the Screener. Powerscreen CT does not raise any material disputes about the Indemnity Clause's scope and admits that "the language in the terms and conditions, if applicable

and valid, could require Powerscreen CT to defend and hold harmless the defendant, third-party plaintiff." Third Party Def. 56(a) Stmt. ¶ 17. Located on the reverse side of the sales invoice for the Screener, [*id.* ¶ 12], the Indemnity Clause states the "Buyer hereby agrees to indemnify, release, defend and hold harmless Seller . . . against any and all suits, actions or proceedings . . . and from any and all claims demands, losses, judgments, damages, costs, expenses or liabilities, to any person whatsoever (including Buyer's and Seller's employees or any third party) . . . regardless of whether any act, omission, negligence (including any act, omission or negligence, relating to the manufacture, design, repair, erection, service or installation of or warnings made or lack thereof with respect to any parts or Equipment furnished hereunder) of Seller . . . caused or contributed thereto." T&C ¶ 15.

While the Terms and Conditions do not define who the "Buyer" and "Seller" are, their identities are clear from the front side of the invoice.[6] There is Powerscreen USA's name and logo in the top-left corner, and the invoice identifies it as the company to which payment should be remitted; in other words, Powerscreen USA is the "Seller." Doc. 60-6 at 2. Similarly, Powerscreen CT is the "Buyer," the party to whom the invoice is being billed and the invoiced item shipped. *Id.* Although the language is generally broad, the Indemnity Clause specifically contemplates who might originate claims and the kinds of claims for which a Buyer would need to indemnify Seller. It explicitly names "Buyer's and Seller's employees," as potential litigants and the nature of potential lawsuits, such as for "negligence," "design," and "warnings made or lack thereof." *See* T&C ¶ 15. Consequently, the language of the Indemnity Clause clearly encompasses Plaintiff's claim, in which

---

[6] The front side of the invoice also states that "[a]ll terms and conditions on the reverse side of this invoice are a part hereof and are binding upon the parties hereto." Doc. 60-6 at 2. The only discernable parties apparent on the invoice are Powerscreen CT and Powerscreen USA.

Plaintiff, a Powerscreen CT employee, alleges Defendants made or distributed a product that was defective in design and lacked the necessary warnings. Doc. 1 at 3–13.

### ii. Binding on Third Party Defendant

The Court now turns to the more difficult issue of whether the Indemnity Clause is binding on Powerscreen CT. There are no genuine disputes of material fact; the parties' dispute centers around a pure contract interpretation question of whether Powerscreen USA was entitled to unilaterally change the terms and conditions governing equipment sales as per the language in the Distribution Agreement. The terms and conditions have included the same or substantially identical indemnity clauses since 2006, [Defs. 56(a) Stmt. ¶ 14], but it appears that Powerscreen CT either did not notice the changes, or, if it did notice, failed to object to the changes. In either case, the Distribution Agreement does not prohibit Powerscreen USA from including the Indemnity Clause within its Terms and Conditions concerning the sale of the Screener. The Court will address each clause that allegedly prevents Powerscreen USA from singlehandedly instituting changes to the terms and conditions.

Beginning with paragraph 6.4 of the Distribution Agreement, the Defendants interpret this provision to mean that the terms and conditions of sale will change "from time to time." Doc. 70 at 4; *see* Distr. Agmt. ¶ 6.4. The Court disagrees. The plain language of this clause leads to two possible readings: (1) Powerscreen USA will sell products from time to time to Powerscreen CT, and those products will come with Powerscreen USA's standard terms and conditions, or (2) Powerscreen USA's standard terms and conditions will sometimes accompany products sold to Powerscreen CT.[7]

_____

[7] The Court thinks it likely that the first possible reading is the parties' intended interpretation. It seems more reasonable that the parties were outlining their buying-selling relationship in which orders would be made on an as-needed basis, as opposed to a standing

*See* Distr. Agmt. ¶ 6.4. There is nothing to suggest that the "from time to time" preposition applies to changes to the terms and conditions because neither the word "changes" nor its synonyms appear in that sentence. Unfortunately for Powerscreen CT though, neither of these plausible readings favors it as they do not suggest limitations on Powerscreen USA to change its own terms and conditions of sale by itself. Both interpretations make clear that the terms and conditions of sale are of those of the "Company's," or Powerscreen USA's, not the product of a mutual agreement.

Paragraph 6.4 then goes on to note that Powerscreen USA's current terms and conditions are attached in Schedule 2 to the Distribution Agreement and the terms and conditions of the Distribution Agreement prevail in the event of a conflict with "such terms and conditions." *Id.* Based on this portion of the clause, Powerscreen CT argues that Schedule 2 is part of the terms and conditions of the Distribution Agreement, so "Schedule 2 controls" if there are conflicts with proposed terms and conditions. Doc. 69 at 11. Third Party Defendant also argues a conflict exists since Schedule 2 does not contain any indemnity clauses. *Id.* The plain reading of paragraph 6.4 and an examination of the Distribution Agreement suggest that the terms of Schedule 2 are not included as part of the "terms and conditions of this [Distribution] Agreement." Distr. Agmt. ¶ 6.4.

First, paragraph 6.4 refers to the terms and conditions of sale and those of the Distribution Agreement as two distinct sets of terms and conditions. The phrase "such terms and conditions" necessarily includes the terms and conditions of sale at the time of contracting because the phrase directly follows after the sentence about "current terms and conditions" in Schedule 2. It is also likely that "such terms and conditions" contemplates future terms and conditions of sale, or else the parties would have said something along the lines of "these terms and conditions" or "only these

_____

order, for equipment.

terms and conditions."  However, Powerscreen CT cannot be right that "Schedule 2 controls" as part

of the Distribution Agreement, since paragraph 6.4 contemplates conflicts between the terms and

conditions of sale and the Distribution Agreement's terms and conditions.  If Schedule 2 were part

of the Distribution Agreement's terms and conditions, the language of paragraph 6.4 would be

unclear as to whether Schedule 2 or the other terms in the Distribution Agreement prevailed in the

event of conflict.  This interpretation would allow for the contract to contradict itself, but leave no

guidance as to how to resolve the contradiction.

Second, the Distribution Agreement does not incorporate Schedule 2 in the manner in which

it incorporates Schedule 1 throughout the contract.  "That a document is attached to a contract does

not conclusively make it part of the contract, particularly where the contract expressly incorporates

certain . . . . documents, but does not incorporate the document in question."  *Detroit Pub. Schs.*

*Program Mgmt. Team v. Valley Forge Ins. Co.*, 483 F. App'x 150, 152–53 (6th Cir. 2012) (citation

and internal quotation marks omitted) (collecting cases) (upholding district court's ruling that an

exhibit was not part of the contract under Michigan law). For example, Schedule 1 defines certain

terms with specificity, e.g., "[t]rade [m]arks" includes the word, "Powerscreen," [Distr. Agmt. at 16],

so a reader would know exactly what trademarks the contract covers.  Clause 1 of the Distribution

Agreement refers to Schedule 1 throughout, making it clear that the references in Schedule 1 are

indeed part of the Distribution Agreement's terms and conditions.  In contrast, the only references

to Schedule 2 are in paragraph 6.4, which clarifies that Schedule 2 contains the "current" terms and

conditions, and in paragraph 9.1, which states that Powerscreen USA will observe the warranty

provisions in its *own* standard terms and conditions of sale.  Distr. Agmt. ¶¶ 6.4, 9.1.

Third, it is clear that the terms and conditions of sale are subject to updates. The phrases "current" and "[i]f there *shall* be any conflict" both point to the possibility of changing terms and conditions. Distr. Agmt. ¶ 6.4 (emphasis added). All of these observations lead the Court to conclude that Schedule 2 is not part of the Distribution Agreement's terms and conditions. Consequently, the terms and conditions of sale in Schedule 2 do not apply to the sale of the Screener.

Even if the Court accepted Powerscreen CT's assertion that Schedule 2 was part of the Distribution Agreement's terms and conditions, there is no conflict between Schedule 2 and the Terms and Conditions at the time of the Screener's sale. Powerscreen CT argues that because Schedule 2 lacks an indemnity clause, "the existence of such a provision is inconsistent with it."[8] Doc. 69 at 11. Powerscreen CT cites to no precedent supporting this assertion, and the Court fails to see how this could be so. A conflict would exist, for example, if Schedule 2 indicated that Powerscreen USA was liable for product liability claims or that neither party would indemnify the other for any legal proceedings. However, Schedule 2 says nothing whatsoever about indemnity clauses, and so the inclusion of the Indemnity Clause does not cause a conflict.

Like paragraph 6.4, paragraph 15.1 of the Distribution Agreement also does not prevent Powerscreen USA from unilaterally changing the terms and conditions of sale. Third Party

---

[8] Actually, the indemnity clause could be quite consistent with paragraph 9 of Schedule 2. It contains a general disclaimer absolving Powerscreen USA from any liability:

> In no event will the Company be liable for any loss, injury, or damage howsoever arising except herein set forth and shall not on any account be liable for consequential loss or damage howsoever caused or arising stoppage or breakdown of machinery or any part thereof and shall not be liable in any other way for the performance of the machinery in question.

Distr. Agmt. at 17.

Defendant is correct that this clause means that "no other terms and conditions were in effect at the time the contract was signed by both parties, including a clause for indemnification." Doc. 69 at 10. However, the Distribution Agreement supersedes "all *prior* communications, representations, stipulations, undertakings and agreements," Distr. Agmt. ¶ 15.1 (emphasis added), not *future* communications, representations, etc. *See Energy Home, Div. of Southern Energy Homes, Inc., v. Peay*, 406 S.W.3d 828, 834 (Ky. 2013) ("In general, a 'merger clause' is a contractual provision to the effect that the written terms of the contract may not be varied by *prior agreements* because all such agreements have been merged into the written document . . . . A merger and integration clause does not prohibit the parties from future agreements to modify or even to rescind the contract.") (emphasis in the original) (citations and internal quotation marks omitted). In addition, paragraph 15.1 references "terms and conditions contained *or* referred to herein"—the placement of "or" suggests there are terms and conditions that are referred to but not contained within the Distribution Agreement. *See id.* (emphasis added). This further supports a finding that the limitations on changing the terms of the Distribution Agreement do not apply to the terms and conditions of sale because the Distribution Agreement does not contain the terms and conditions of sale.

Powerscreen CT also asserts that paragraph 16 mandates that any variations requires the written consent of both parties. Doc. 69 at 10. It argues that because neither Powerscreen USA nor Powerscreen CT signed the present-day Terms and Conditions, i.e., the amended version of Schedule 2, then the Indemnification Clause is not enforceable. *Id.* This argument fails to persuade. Paragraph 16 is clear that it applies only to the "Agreement." Distr. Agmt. ¶ 16. For Powerscreen CT's argument to succeed then, the terms and conditions of sale must be part of the Distribution Agreement. As explained *supra*, the Distribution Agreement does not incorporate the terms and

conditions of sale. Powerscreen USA's terms and conditions of sale is a separate contract to which the Distribution Agreement references but does not include. As a result, nothing in paragraph 16 bars Powerscreen USA from changing its terms and conditions of sale on its own.

Because paragraph 16 does not grant Powerscreen CT the right to approve of changes to Powerscreen USA's terms and conditions of sale, its argument regarding paragraph 17.1 fails as well. Paragraph 17.1 acknowledges that failure to exercise or delay in exercising any right does not operate as a waiver of that right. Distr. Agmt. ¶ 17.1. Because the Distribution Agreement does not mandate immediate objections then, Powerscreen CT asserts that its failure to object is not a waiver of its rights to approve of any changes in writing pursuant to paragraph 16. Doc. 69 at 12. However, paragraph 16 does not grant Powerscreen CT any rights regarding Powerscreen USA's terms and conditions of sale, meaning it did not have any rights to waive or assert as per paragraph 17 in the first place. This is not to say Powerscreen CT lacked any ability to protest the terms and conditions of sale. Powerscreen CT could have proposed a new clause to the Distribution Agreement in accordance with paragraph 16 that would set up a conflict with the Indemnity Clause. The new clause would then prevail over the Indemnity Clause because the new clause would be contained within the Distribution Agreement and the Distribution Agreement controls. Distr. Agmt. ¶ 6.4. That proposal was never made.

Finally,[9] paragraph 2 of Schedule 2 states that "[a]ny Contract between the Company and the

---

[9] Powerscreen CT also points out in its public policy argument that the parties chose to strike out the section in Schedule 1 regarding "Product Liability Insurance." Doc. 69 at 18. It reasons that, "[i]f the contractual relationship really required indemnity by the distributor, Powerscreen CT, then it seems logical that Powerscreen USA would also require insurance to cover that risk." *Id.* However, the parties actually struck out the words "Product Liability Insurance - Minimum Cover." Doc. 60-3 at 16. It is thus equally plausible that the parties assumed Powerscreen CT would get product liability insurance, but Powerscreen CT was free to

customer shall incorporate these decisions, which conditions shall not be varied other than with written confirmation by the Company from its head office." Doc. 60-3 at 17. The plain reading of this provision is narrower than Powerscreen CT suggests. Powerscreen CT argues that this clause, along with the rest of the Distribution Agreement, mandates that the terms and conditions of sale "can only be altered by mutual assent and agreement in writing signed by both parties." Doc. 69 at 12. This is a stretched reading of paragraph 2 of Schedule 2. Paragraph 2 merely limits Powerscreen USA's ability to unilaterally change the terms and conditions as applied to a particular sale, i.e., Powerscreen USA cannot sell a product and then apply a new set of terms and conditions to a product they have already sold to a buyer. There is no mention of allowing the buyer to have input in paragraph 2. More importantly, it does not inhibit Powerscreen USA's ability to change the terms and conditions governing *future* sales. In fact, nothing in the Distribution Agreement, Schedule 2, or the Terms and Conditions prevent Powerscreen USA from unilaterally updating its own terms and conditions of sale.

## C.    Public Policy

Although the unambiguous language of the contracts between Powerscreen CT and Powerscreen USA favors granting this motion for summary judgment, the Court must also consider public policy concerns that are specific to contracts and indemnification. "Indemnity is a duty to make good any loss, damage, or liability incurred by another, and arises from a promise by the indemnitor to safeguard or hold harmless a party against an existing or future loss, liability, or both." *Enerfab, Inc. v. Kentucky Power Co.*, 433 S.W.3d 363, 366 (Ky. Ct. App. 2014) (citations and internal quotation marks omitted). "[G]eneral principles of contract construct apply equally to

---

determine how much coverage was necessary.

indemnification agreements." *Id.* "The right of an indemnitee to recover of the indemnitor under a contract of indemnity according to the terms of such a contract is well recognized. Such a contract is not against public policy and will be enforced if the indemnitee has suffered loss thereunder and has complied with its terms." *United States Fid. & Guar. Co. v. Napier Elec. & Constr. Co.*, 571 S.W.2d 644, 646 (Ky. Ct. App. 1978) (quoting *Nat'l Sur. Corp. v. Peoples Milling Co.*, 57 F. Supp. 281, 282 (W.D. Ky. 1994). In other words, Kentucky law will generally uphold indemnity clauses unless it offends public policy.

Kentucky law consequently recognizes that contracts between those with unequal bargaining power may violate public policy. In *Greenwich Ins. Co. v. Louisville & Nashville R.R.,* 66 S.W. 411 (Ky. 1902), the then-highest Kentucky state court established the basic principles regarding exculpatory contracts. The parties in this case disputed whether an indemnity clause in a contract between a railroad company and a company leasing a building from the railroad company exempted the railroad company from paying damages caused by a fire. *Id.* at 412. The court determined that these two businesses were "dealing at arm's length and upon an equal footing[,]" so there no was disparity in bargaining power. *Id.* at 413. As a result, the railroad company was "not liable for the destruction or damage to the building under the contract quoted . . . [f]or mere carelessness." *Id.* at 412. On the other hand, the court noted that had the railroad company and its *passengers* contracted away the railroad company's liability for the fire, which was allegedly caused by the railroad company's negligence, an indemnity clause would be against public policy. *Id.* This is because there was a disparity in bargaining power between the railroad company and the general public—the company had a monopoly, so customers had no choice but to use the company's services. *Id.* at 412; *see also Cumberland Valley Contractors, Inc. v. Bell Cty. Coal Corp.*, 238 S.W.3d 644, 650 (Ky.

2007) (summarizing *Greenwich Ins. Co.*); *Jones v. Hanna*, 814 S.W.2d 287 (Ky. Ct. App. 1991); *Zeitz v. Foley*, 264 S.W.2d 267 (Ky. 1954). See also *Ward Edison's Prof'l Cleaning Servs., LLC v. Liberty Landmark Grp., LLC*, No. 2014-CA-00140-MR, 2016 WL 3886948, at *5 (Ky. Ct. App. July 15, 2016) ("Here, we have an arms-length transaction between two corporate entities with equal bargaining power, resulting in a contract with reasonable terms."). "Unconscionability deals with grossly unequal bargaining power at the time of the contract's formation . . . . [U]nconscionability rarely exists unless the buyer is a consumer." *J & E Constr., Inc. v. Bobcat Enters., Inc.*, No. 07-235-JBT, 2008 WL 3982683 at *9 (E.D. Ky. Aug. 26, 2008) (internal quotation marks omitted) (quoting *Lewis Refrigeration Co. v. Sawyer Fruit, Vegetables & Cold Storage Co.*, 709 F.2d 427, 437 (6th Cir. 1983)).

Powerscreen CT contends that it occupied a "weaker bargaining position" because the "Distribution Agreement requires that Powerscreen CT only sell third-party plaintiffs' products and not engage in the distribution of any other company's products." Doc. 69 at 14–15. While it is true that Powerscreen CT exclusively sold products from Powerscreen USA, that has no bearing on the bargaining position at the time of contracting. These were two commercial businesses, contracting to create an arrangement beneficial to both parties to sell equipment worth hundreds of thousands of dollars. *See*, *e.g.*, Docs. 60-5, 60-6, 60-8. There is nothing in the record to suggest the companies did not have equal bargaining power prior to entering into any contracts. Even if there were some power imbalance, "Kentucky courts frequently have upheld parties' bargains, even if one-sided, examining all the circumstances surrounding the transaction and the relative bargaining positions of the parties, and the "exceptional cases" deviating from this general rule have "involved one-sided, oppressive and unfairly surprising contracts, and not . . . the consequences per se of uneven

bargaining power or even a simple old-fashioned bad bargain." *Wallace Hardware Co., Inc. v. Bill Abrams & L.D. Abrams*, 223 F.3d 382, 394 (6th Cir. 2000) (quoting *L.K. Comstock & Co. v. Becon Const. Co.*, 932 F. Supp. 948, 972–73 (E.D. Ky. 1994) (internal quotation marks omitted)).

Because Powerscreen CT did not have a weaker bargaining position, its argument that the Indemnity Clause is antithetical to the purposes of tort law must also fail.[10] *See* Doc. 69 at 15. Powerscreen CT's position has some truth to it—product manufacturers are likely the ones responsible for fixing product defects—but its is also true that parties can often contract around their expected obligations or seek insurance to offset liability for their responsibilities. Nor does Kentucky law prohibit indemnification clauses when parties have equal bargaining power. *See Speedway Superamerica, LLC v. Erwin*, 250 S.W.3d 339, 344 (Ky. App. 2008) ("[S]uch provisions, whether pre-injury releases or indemnification provisions applied to defend against the indemnitee's own negligence, are not against public policy generally, but they are when agreed to by a party in a clearly inferior bargaining position."); *Vaughn v. Konecranes, Inc.*, No. 5:14-136-DCR, 2015 WL 3453457, at *2 (E.D. Ky. May 29, 2015) ("[P]arties may contractually provide for indemnification for, *inter alia*, the costs incident to potential legal liability as well as for the legal liability itself . . . . Such a contract is not against public policy and will be enforced if the indemnitee has suffered loss thereunder and has complied with its terms.") (citation and internal quotation marks omitted); *Codell Constr. Co. v. Commonwealth*, 566 S.W.2d 161, 164 (Ky. App. 1977) ("The final contract that resulted . . . is not ambiguous, and is therefore not susceptible to any reformation or other rewriting

---

[10] Powerscreen CT also argues that Kentucky state law prohibits parties from contracting away liability for damages caused by failure to comply with a safety statute. Doc. 69 at 17. However, the Court will not address this argument because, as Powerscreen CT acknowledges, Connecticut law does not have a safety statute like that of Kentucky, *id.*

by this Court.").

In addition, as Defendants point out, Powerscreen CT did not raise objections to the Indemnity Clause until this case. Doc. 60-1 at 10–11. It must first be noted that Powerscreen CT indeed had the power to object, despite the fact that Powerscreen USA unilaterally created and then changed its terms and conditions of sale. In that way, Powerscreen USA's terms and conditions of sale are much like adhesion contracts, which "relegate[] to the subscribing party only the opportunity to adhere to the contract or reject it." *Schnuerle v. Insight Commc'ns. Co., L.P.*, 376 S.W.3d 561, 576 (Ky. 2012) (citation and internal quotation marks omitted) (noting also not all adhesion contracts are *per se* improper). As mentioned *supra* though, paragraph 16 of the Distribution Agreement allows Powerscreen CT to propose changes, and those changes would prevail over Powerscreen USA's terms and conditions of sale in the event of conflict as per paragraph 6.4 of the Distribution Agreement. With Powerscreen CT's rights as per the Distribution Agreement in mind, this takes the Terms and Conditions out of the realm of adhesion contracts. Powerscreen CT certainly retains the right to propose changes to the Distribution Agreement in accordance with paragraph 16, but it cannot be said that this right extends to changes that would retroactively rewrite its other contracts, i.e., the Terms and Conditions.

Case law is clear that Powerscreen CT's silence since receiving the Screener constitutes acceptance of Powerscreen USA's Terms and Conditions of sale. In *Middletown Eng'g Co. v. Climate Conditioning., Inc.*, 810 S.W.2d 57 (Ky. 1991), the purchaser argued that the seller's terms and conditions were never part of the contract between the two because the purchaser never signed the forms. The Court found that, because (1) the seller "expressly conditioned its acceptance of the purchase offer on the purchaser's assent to the additional terms and conditions" and (2) no objections

to the terms and conditions were made "until long after the goods were delivered and installed," the terms and conditions were binding. *Id.* at 59. Here, paragraph 1 of the Terms and Conditions states that "Seller's acceptance of Buyer's purchase order is conditional upon Buyer's acceptance of all the terms and conditions contained in this agreement." Doc. 60-6 at 3. As for timing, Powerscreen CT had sent a purchase order without any terms and conditions in 2011, [Doc. 60-5], Powerscreen USA sent an invoice for the Screener with the Terms and Conditions on the reverse side in 2012, [Doc. 60-6], and Powerscreen CT only first raised objections in the present litigation. In addition, Kentucky has adopted the Uniform Commercial Code, which states that additional terms are part of the contract when "acceptance is expressly made conditional on assent to the additional or different terms."[11] Ky. Rev. Stat. Ann. § 355.2-207(1) (West 2018). *Cf. Menorah Ins. Co., Ltd. v. W.F. Whelan Co., Inc.*, 110 F. App'x 524, 527 (6th Cir. 2004) (holding that "silent, consistent performance" demonstrated that a sophisticated company "agreed to be bound by terms in the invoices" under Michigan law). See also *Thompson v. The Budd Co.*, 199 F.3d 799, 809–10 (6th Cir. 1999) (disregarding lack of signature because indemnitee received consideration, contract was written, and course of dealings included a history of indemnity provisions).

### D. Limits of the Indemnity Clause

The Terms and Conditions accompanying the sale of the Screener are clearly written, obligating Powerscreen CT to indemnify Powerscreen USA for claims such as the ones put forth by the Plaintiff in this case. The unambiguous language of the Distribution Agreement, which can

---

[11] Section 355.2-207 also implies that objections must be timely: "Between merchants, [additional] terms become part of the contract unless . . . [n]otification of objection to them has already been given or *is given within a reasonable time after notice of them is received*." Ky. Rev. Stat. Ann. § 355.2-207(2)(c) (West 2018) (emphasis added).

supersede the Terms and Conditions in the event of conflict, does not curtail Powerscreen CT's contractual responsibilities in this instance either because no conflict of interpretation exists. Nor does public policy allow the Court to nullify the Indemnity Clause because Powerscreen USA and Powerscreen CT are two companies of equal bargaining power. *See Cumberland Valley Contractors, Inc. v. Bell Cty. Coal Corp.*, 238 S.W.3d 644, 654 (Ky. 2007) (citations and internal quotation marks omitted) ("Kentucky courts have long upheld exculpatory clauses in arm's-length transactions between sophisticated parties with equal bargaining power and allowed such parties to bargain against liability for their own negligence and even gross negligence short of willfulness and wantonness.").

However, the Indemnity Clause is limited in one important respect: Powerscreen CT does not need to indemnify Powerscreen International. Defendants make this motion for summary judgment together, but the relevant contracts presented to this Court are only between Powerscreen USA and Powerscreen CT. The Court sees no mention of Powerscreen International in the Distribution Agreement and the Terms and Conditions. The Indemnity Clause requires the Buyer, Powerscreen CT, to indemnify "Seller, its directors, officers, employees, agents, representatives, successors, and assigns," [T&C ¶ 16], but Defendants have not presented evidence that Powerscreen International qualifies as part of any of these categories. Accordingly, Powerscreen CT is bound by a valid and enforceable Indemnity Clause to hold only Powerscreen USA, not Powerscreen International, harmless from the Plaintiff's claims in this action.

## IV. CONCLUSION AND ORDER

For the foregoing reasons, Defendants' Motion for Summary Judgment, [Doc. 60], is GRANTED in part and DENIED in part. The parties are directed to conduct further litigation in this case in a manner consistent with this Ruling.


It is SO ORDERED.

Dated: New Haven, Connecticut
      October 5, 2018

                                      */s/ Charles S. Haight, Jr.*
                                      CHARLES S. HAIGHT, JR.
                                      Senior United States District Judge